UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 06-22463-CIV-HUCK/SIMONTON

CBS BROADCASTING, INC.,
AMERICAN BROADCASTING COMPANIES,
INC., THE ASSOCIATED PRESS, CABLE NEWS
NETWORK LP, LLLP, FOX NEWS NETWORK,
L.L.C., and NBC UNIVERSAL, INC.,

    Plaintiffs,
vs.

SUE COBB, in her official capacity as
Secretary of the State of Florida, and
LESTER SOLA, in his official capacity as
the Supervisor of Elections of Miami-Dade County,
Florida and as representative of a defendant class of
all county Supervisors of Elections in the State of Florida.

    Defendants.
_____/

## ORDER GRANTING PLAINTIFFS DECLARATORY RELIEF

THIS MATTER is before the Court upon Plaintiffs' Motion for Preliminary Injunction [D.E. #3], filed on September 29, 2006. Plaintiffs, various media organizations involved in newsgathering activities, seek to enjoin Defendants, Secretary of State Sue Cobb ("Cobb") and Lester Sola ("Sola"), Supervisor of Elections of Miami-Dade County, Florida, from enforcing Fla. Stat. §102.031(4)(a), (b) (2005). That statute prohibits the solicitation of voters inside a polling place or within 100 feet of the entrance to any polling place. Fla. Stat. § 102.031(4)(a). The term "solicit" is defined to include "seeking or attempting to seek any vote, fact, opinion, or contribution" and "conducting a poll." § 102.031(4)(b). Plaintiffs contend that this law, as applied to Plaintiffs' newsgathering and exit-polling activities, violates the First Amendment as made applicable to the states through the Fourteenth Amendment. Compl. ¶ 1.

The parties, recognizing the time-sensitive nature of this matter in light of the upcoming November 7, 2006 election, agreed to proceed to a final hearing on the merits of the case as to whether this Court should issue a permanent injunction. The Court held a hearing on the matter on October 20, 2006. Because the statute's restrictions violate the First and Fourteenth Amendments, the Court grants Plaintiff's request that the Defendants be permanently enjoined from enforcing Section 102.031(4)(a) as to their exit-polling activities. The statute impermissibly proscribes constitutionally protected exit polling. Moreover, the statute is not narrowly tailored to address the significant interests of the State.

### I.     Background of Florida Statute § 102.031.

Section 102.031(4)(a) has undergone several amendments in its history, all of which have been invalidated under the First Amendment. In 1984, Florida Statute § 104.36 prohibited the solicitation of votes, contributions, or opinions within 100 feet of any polling place. A political action committee seeking to solicit signatures on initiative petitions sued and obtained a preliminary injunction barring enforcement of the statute. *Clean-Up '84 v. Heinrich*, 582 F. Supp. 125 (M.D. Fla. 1984). After a non-jury trial on the merits, the court struck down the statute as unconstitutional. *Clean-Up '84 v. Heinrich*, 590 F. Supp. 928 (M.D. Fla. 1984), *aff'd*, 759 F.2d 1511 (11th Cir. 1985).

In October 1985, the Spanish International Communications Corporation obtained a temporary restraining order from this Court, enjoining the State's threatened enforcement of Section 104.36 against the Plaintiff's television station to prevent it from exit polling within 300 feet of the polling place in the November 1985 election. *Spanish Int'l Commc'ns Corp. v. Firestone*, No. 85-3453-CIV-Hastings (S.D. Fla. Nov. 1, 1985). Most recently, this Court struck down a version of Section 102.031 which prohibited solicitation of all opinion from the voters of Florida, within 150 feet of the polling place. *CBS v. Smith*, 681 F. Supp. 794, 802 (S.D. Fla. 1988); *see also Florida Comm. for Liability Reform v. McMillan*, 682 F. Supp. 1536, 1543 (M.D. Fla. 1988) (entering a

preliminary injunction barring enforcement of the same statute).

The Florida legislature then amended Section 102.031 in 1989, reducing the "restricted zone" from 150 feet to 50 feet. Notably, "exit polling was permitted under any distance, provided that such polling took place in a 'separately marked area . . . so as not to disturb, hinder, impede, obstruct, or interfere with voter access to the polling place or polling room entrance' and was clearly identified as an activity in which voters may participate voluntarily." Compl. ¶ 33. Plaintiffs concede that the 1989 version of Section 102.031 was constitutional. In 2005, the Florida legislature again amended Section 102.031, imposing the present restrictions on solicitation. The issue before the Court is whether the 2005 amendments to Section 102.031(4)(a) comport with the requirements of the First Amendment.

## II.  Facts

"Properly defined, the term 'exit poll' refers to the collecting of data from a random sample of voters at a sample of polling places on election day. This is accomplished unobtrusively by approaching voters after they leave the polling place in a scientifically pre-determined pattern . . . and asking if they would be willing to fill out a brief, anonymous questionnaire." Aff. of Joseph W. Lenski ¶ 5. Voters are only approached after they have voted, and their participation is strictly voluntary. *Id.* ¶ 7. Plaintiffs (and others) use the information obtained from the exit polls to "identify and comment on social and political trends." *Id.* ¶ 10. Moreover, the data collected from exit polling have been used extensively in research by political scientists, sociologists, public policy specialists, and journalists. Aff. of Robert Y. Shapiro ¶ 6.

Although Defendants do not seriously dispute the non-disruptive nature of exit polling, Cobb's Declarant, Kurt S. Browning, Supervisor of Elections for Pasco County, Florida, states that the negative cumulative effect of solicitation of voters, including exit polling, is to impede voter access to the polls, increase voter dissatisfaction, and decrease voter participation. Browning Decl.

¶ 8. Mr. Browning notes that he and his staff have received numerous complaints from voters who have found their entrance and exit to polling places has been impeded by various individuals soliciting or offering information. *Id.* ¶ 6. Importantly, Mr. Brown never specifically identifies exit polling as the source of any complaint he has received.

Plaintiffs have provided contrary evidence, in fact. In a review of 5,090 complaints submitted to the Election Incident Reporting System by Florida voters, "[n]ot one of those citizen complaints referenced exit-polling behavior." Workman Decl. ¶ 9. Likewise, the official Florida House of Representatives Staff Analysis report describing the 2005 amendments to Section 102.031 "does not indicate that exit-polling activities have caused any polling place disturbances." *Id.* ¶ 10. Plaintiffs also refute the assertion that solicitation activities have led to decreased voter participation. According to the web site of the Florida Department of State, Division of Elections, statewide voter participation has increased from 67% voter turnout in 1996 to 70% in 2000 to 74% in 2004. *Id.* ¶ 3. (citing Florida Dep't of State, Division of Elections, http://election.dos.state.fl.us/online/voterpercent.shtml).

### III.  Discussion

#### A.  Nature of Speech

The First Amendment of the Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. A challenge to a statute on First Amendment grounds requires that we first consider whether the speech or conduct is protected by the United States Constitution. *Clean-Up '84*, 759 F.2d at 1513. The Supreme Court of the United States "has recognized that 'the First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office.'" *Burson v. Freeman*, 504 U.S. 191, 196 (1992) (quoting *Eu v. San Francisco City Democratic Central Comm.*, 489 U.S. 214, 223 (1989)) (internal quotation omitted). Moreover, this Court has recognized that "the conduct of exit polling and

journalistic interviews are protected by the First Amendment guarantees of free speech and free press." *CBS*, 681 F. Supp. at 802.

### B.     Level of Scrutiny

Section 102.031(4)(a) bars speech in quintessential public forums, which include those places "which by long tradition or by government fiat have been devoted to assembly and debate." *Perry Educ. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45 (1983). The statute prohibits solicitation of opinion from all voters, "without concern as to whether the prohibition encompasses public streets, public sidewalks, or other traditionally public forums." *CBS*, 681 F. Supp. at 802. Even in such quintessential public forums, however, "the government may regulate the time, place, and manner of expressive activity, so long as such restrictions are content-neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternatives for communication." *Burson*, 504 U.S. at 197 (citing *United States v. Grace*, 461 U.S. 171, 177 (1983)). Therefore, we first must determine whether Section 102.031(4)(a) is a content-neutral or a content-based restriction.

Cobb[1] asserts that the statute is content-neutral because it applies uniformly to all types of speech. Cobb makes several arguments in support of applying the intermediate level of scrutiny. First, Cobb relies upon *CBS* for the proposition that the statute restricts "virtually every form of expression between persons within 150 feet of the polling place." 681 F. Supp. at 796. However, the *CBS* Court never reached a determination of whether the statute was content-neutral or content-based, finding that the statute was "neither narrowly tailored to accomplish the significant state interest in protecting the orderly functioning of the electoral process, nor [was] it the least restrictive means available for accomplishing that legitimate goal." 681 F. Supp. at 796.

---

[1] Sola takes no position on the merits of Plaintiffs' Complaint. Def. Lester Sola's Mem. In Resp. To Pl.'s Compl. at 1.

Next, Cobb contends that Section 102.031(4)(a) is distinguishable from the content-based Tennessee statute that was upheld in *Burson* because the former covers all kinds of speech, while the latter only restricted speech related to a political campaign. Indeed, Section 102.031(4)(a) does proscribe a broader swath of speech than did the Tennessee statute at issue in *Burson*. That broader reach, however, does not mean that Section 102.031(4)(a) is content-neutral. For one, it only prohibits the solicitation of *voters*. Opinions and facts may be solicited from non-voters within the restricted area. Like the Tennessee statute in *Burson*, Section 102.031(4)(a) does not reach some other categories of speech. 504 U.S. at 197. As stated in the Plaintiffs' reply, "[i]t is *not* illegal under Section 102.031(4)(a) for someone to make a speech about any subject, to ask questions of non-voters, or to sing the Florida Gators' fight song within 100 feet of polling places, but it *is* against the law to ask a voter about the ballot they cast." Pl.'s Reply at 4. In *Burson*, the Court stated that "the First Amendment's hostility to content-based regulation extends not only to a restriction on a particular viewpoint, but also to a prohibition of public discussion of an entire topic." *Id.* Section 102.031(4)(a) does not prohibit myriad other forms of speech, simply solicitation of voters, making it a content-based restriction on speech.

As a facially content-based restriction on political speech in a public forum, Section 102.031 "must be subjected to exacting scrutiny: the State must show that the 'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.'" *Id.* (citing *Perry Educ. Assn.*, 460 U.S. at 45). This Court notes that the Supreme Court in *Burson* seems to have slightly modified the strict scrutiny test, however, in some rare instances. Recognizing the difficulty that states have in making specific findings about the effects of a voting regulation, the Court permitted legislatures "to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not *significantly impinge* on constitutionally protected rights." *Id.* at 209 (citing *Munro v. Socialist Workers Party*, 479 U.S. 189,

195-96 (1986)) (emphasis in original).  This modified burden of proof only applies "when the First Amendment right threatens to interfere with the act of voting itself." *Id*. at 214.  Where the First Amendment right does not interfere with the act of voting itself, the State must come forward with more specific findings to support regulations directed at intangible influence. *Id.*  Ultimately, the question of which level of scrutiny applies is academic here because the statute is not narrowly tailored to accomplish a significant state interest.  Therefore, under either strict or intermediate scrutiny, the statute fails to pass constitutional muster.

### C. Analysis

Although this Court found Section 102.031 unconstitutional in *CBS*, Cobb argues that the 2005 amendments to the statute are constitutionally permissible because (1) the Supreme Court's decision in *Burson* compels a different result, and (2) the reduction of the "no solicitation" zone from 150 feet to 100 feet makes it constitutionally compliant.

#### 1. *Burson v. Freeman*

First, Cobb relies upon the notion that *Burson* has changed the landscape on the constitutionality of Section 102.031(4)(a) since it was struck down in *CBS*.  In *Burson*, the U.S. Supreme Court upheld against a First Amendment challenge a Tennessee statute that established a "campaign-free zone" within 100 feet of the entrance to a polling place.  504 U.S. at 211.  Noting the long history of voter intimidation and election fraud, the Court recognized that the state had a compelling interest in protecting the right of its citizens to vote freely for the candidates of their choice in an election conducted with integrity and reliability. *Id.* at 199.  The Court concluded:

> we reaffirm that it is the rare case in which we have held that a law survives strict scrutiny.  This, however, is such a rare case.  Here, the State, as recognized administrator of elections, has asserted that the exercise of free speech rights conflicts with another fundamental right, the right to cast a ballot in an election free from the taint of intimidation and fraud.  A long history, a substantial consensus, and simple common sense show that some restricted zone around polling places is necessary to

> protect that fundamental right. Given the conflict between these two rights, we hold that requiring solicitors to stand 100 feet from the entrances to polling places does not constitute an unconstitutional compromise. *Id.* at 211.

Contrary to Cobb's suggestion, however, *Burson* does not save Section 102.031(4)(a) from its constitutionally impermissible status. There, the goal was to protect the voter against inappropriate "electioneering" as the voter was entering the polling station. Exit polling does not implicate the same voting-integrity concerns as electioneering.

As noted above, the Plaintiffs' exit polling is accomplished "unobtrusively" and voters complete the written interviews completely voluntarily. Importantly, voters are only approached after they have voted. Although Mr. Browning has made generalized assertions that numerous soliciting activities, including exit polling, contribute to a broader negative "cumulative effect," he provides no direct or specific evidence that exit polling itself has led to any negative consequences for voters. At best, Mr. Browning merely implies, but does not directly state, that exit polling may have an adverse effect on voters. The Court draws no such inference. The Court would expect that if Cobb had any real, direct evidence to support her contention that exit polling adversely affects the voting process, she would have presented it in an unequivocal way. Indeed, the undisputed evidence specifically directed at exit polling suggests that the contrary is actually true. In a review of voter complaints, Mr. Workman found not one reference to exit pollers causing problems. Likewise, Mr. Workman's declaration shows that voter participation has been continually increasing. Thus, it appears that the Defendants concerns are less problematic than Mr. Browning suggests.

Cobb suggests that the submission of such "hard evidence" is not necessary under the modified strict scrutiny standard established in *Burson*. This argument goes too far. Although Cobb is correct that the *Burson* Court sought to permit states to respond to potential deficiencies in the electoral process with foresight rather than reactively, the Court imposed two important limitations:

(1) the response must be reasonable and not *significantly impinge* on constitutionally protected rights; and (2) the modified burden of proof only applies "when the First Amendment right threatens to interfere with the act of voting itself." *Burson*, 504 U.S. at 214. In cases like this where the First Amendment right does not interfere with the "act of voting itself," the State must come forward with more specific evidence to support regulations directed at intangible influence. *Id.* Exit polling has not been shown to interfere with "the act of voting itself." Indeed, the very nature of exit polling is that it will take place only after a citizen has voted.[2] Numerous courts, including those upholding "campaign-free" zones, have recognized the distinction between exit polling and electioneering. *See, e.g., American Broadcasting Co., Inc. v. Blackwell*, No. 1:04cv0750 at 33-34 (S.D. Ohio Sept. 26, 2006) (striking down statute prohibiting exit polling within 100 feet of polling station); *see also Schirmer v. Edwards*, 2 F.3d 117, 122 (5th Cir. 1993) ("[w]e reject the application of the exit-polling cases to the present context because the underlying state interests differ in each case. While there is no evidence of widespread voter harassment or intimidation by exit-pollers, there is evidence that poll workers do create these problems").

In sum, the Supreme Court's decision in *Burson* has not made the restrictions on exit polling in Section 102.031(4)(a) constitutionally acceptable. Cobb has failed to provide any meaningful evidence that exit polling has any history of leading to voter intimidation, impeding voter access to the polls, or encouraging election fraud. The *Burson* plurality even went so far as to suggest that general public access to polling places would serve to discourage voter intimidation and fraud. 504 U.S. at 207. *See also Blackwell*, Slip op. at 34 ("The presence of the press at polling places would likely serve as a deterrent to fraud and intimidation"). Because exit polling is significantly distinguishable from the electioneering and campaigning, the *Burson* decision does not support a

---

[2] Of course, it would stand to reason that the State could prevent a rogue exit-poller from interfering with a voter's access to the polling station.

finding of Section 102.031(4)(a)'s constitutionality.

### 2. Reduction to 100 Feet

Because *Burson* alone does not save Section 102.031(4)(a), we must determine whether the reduction of the "no solicitation" zone from 150 feet to 100 feet makes the statute constitutionally permissible. It does not. The *Burson* Court, in rejecting the Tennessee Supreme Court's suggested reduction of the boundary from 100 feet to 25 feet, called it a "difference only in degree, not a less restrictive alternative in kind." 504 U.S. at 210 (citing *Buckley v. Valeo*, 424 U.S. 1, 30 (1976)). The 50-foot difference in this case does not change the fact that the statute remains unconstitutionally broad. As mentioned above, the exit-polling activities of the Plaintiffs are protected by the First Amendment. "[T]here is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of government affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). As this Court noted in *CBS*, "without some protection for seeking out the news, freedom of the press could be eviscerated. . . . And, indeed, without the ability to collect information, viewpoints, and opinions from voters, the right to report and publish political news would be left with little means of fulfillment." 681 F. Supp. at 803. This sentiment is confirmed by affidavit of Mr. Lenski, who states that "requiring our exit pollers to stand at least 100 feet from the selected polling places substantially impairs their exit-polling activities and, accordingly, substantially reduces the statistical reliability and accuracy of their exit polls." Lenski Aff. ¶ 8. This unrefuted evidence stands in stark contrast to Cobb's failure to show any adverse effect of exit polling on the voting process.

The State's interest in the voting process, to be sure, is also substantial. The State has an interest in protecting the orderly administration of elections and the election process, in increasing voter participation, and in providing easy access to the polls. Section 102.031(4)(a) does not properly address those concerns, however. It restricts many forms of constitutionally protected

expression from public streets and sidewalks.  In addition, the statute is not narrowly tailored to meet its significant purpose.  Despite the lack of significant evidence suggesting any problems with exit polling, the State seeks to prohibit all exit polling and reporters' interviews without any regard as to whether they are disruptive.  The statute does not prohibit a journalist from entering the restricted zone. As mentioned above, the statute does not prohibit pollers from soliciting non-voters in the restricted zone.  The same concerns that this Court expressed in *CBS* remain because "it prohibits even peaceful, thoughtful discussions with voters regarding how they voted and why. . . . It does not matter that the voter wants to speak or that the reporter wishes to listen, or that the discussion is wholly non-disruptive."  681 F. Supp. at 803.  Because the statute so broadly restricts expressive activity, the State must use far more restrictive means in achieving its goal.[3]  As noted above, the prohibition of exit polling does not serve to further any of the State's constitutionally legitimate interests in this case.  Accordingly, for the foregoing reasons, it is hereby

ORDERED that Plaintiffs' Request for Declaratory Relief and a Permanent Injunction is GRANTED.  Defendants are barred from enforcing Fla. Stat. § 102.031(4)(a) as applied to Plaintiffs' exit-polling activities.

DONE AND ORDERED in Chambers, Miami, Florida, this October 24, 2006.

_____
Paul C. Huck
United States District Judge

**Copies furnished to:**
All Counsel of Record

---

[3] In fact, the version of Section 102.031 that existed after the 1989 amendments represented such a valid, narrowly constructed law that limited activity at and around polling stations.